FILED
2011 Jun-23  PM 01:52
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION**

| | | |
|---|---|---|
| **EUNICE RENAE JOHNSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CV-10-BE-0411-W** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of the Social** | ) | |
| **Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION**

**I.  Introduction**

The claimant, Eunice Renae Johnson, filed applications for Disability Insurance Benefits and Supplemental Security Income payments on April 12, 2007, alleging disability because of severe back and leg pain beginning on September 22, 2006.  The Commissioner initially denied the claim on June 15, 2007.  The claimant filed a timely request for a hearing before an Administrative Law Judge.  The ALJ held a hearing on April 22, 2009. (R. 9).  In a decision dated August 27, 2009, the ALJ found that the claimant was not disabled within the meaning of the Social Security Act, and, therefore, was not eligible for Disability Insurance Benefits and Supplemental Security Income Payments. (R. 17).  On December 29, 2009, the Appeals Council denied the claimant's request for review. (R. 1).  The claimant has exhausted her administrative remedies, and this court has jurisdiction under 42 U.S.C. §§ 405(g) and 1631(c)(3).  For the reasons stated below, the decision of the Commissioner will be reversed and remanded.

1

## II.  Issue Presented

The claimant presents the following issue for review:  whether the ALJ erred *either* by failing to properly apply the pain standard to the subjective testimony regarding the side effects of her medication *or* by accepting her testimony but failing to limit her RFC and available jobs through the use of a vocational expert.[1]

## III.  Standard of Review

The standard for reviewing the Commissioner's decision is limited.  This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if his factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999.  This court does not review the Commissioner's factual determinations *de novo*, but will affirm those factual determinations that are supported by substantial evidence.  "Substantial evidence" is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings."  *Walker*, 826 F.2d at 999.  A reviewing court must not look

---

[1]Although the claimant raises other issues, because of the court's disposition, those issues need not be addressed.

only to those parts of the record that support the decision of the ALJ, but also must view the

record in its entirety and take account of evidence that detracts from the evidence relied on by the

ALJ.  *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

## IV.  LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the

person cannot "engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §

423(d)(1)(A).  To make this determination, the Commissioner employs a five-step, sequential

evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments
> set forth in 20 C.F.R. pt. 404, subpt. P, app.1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next
> question, or, on steps three and five, to a finding of disability.  A negative answer
> to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

In evaluating pain and other subjective complaints, such as the side effects of medication,

the Commissioner must consider whether the claimant demonstrated an underlying medical

condition, and *either* "(1) objective medical evidence that confirms the severity of the alleged

pain arising from that condition *or* (2) that the objectively determined medical condition is of

such a severity that it can reasonably be expected to give rise to the alleged pain." *Holt v.*

*Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991)(emphasis added); *see also Wilson v. Barnhart*,

284 F.3d 1219, 1221 (11th Cir. 2002); 20 C.F.R. § 404.1529.

"When there have been nonexertional factors (such as depression and medication side

effects) alleged, the preferred method of demonstrating that the claimant can perform specific

jobs is through the testimony of a vocational expert." *MacGregor v. Bowen*, 786 F.2d 1050,

1054 (11th Cir. 1986).

## V.  FACTS

The claimant attained a high school degree and was thirty-eight years old at the time of

the administrative hearing. (R. 22, 23).  Her past work experience includes employment as a Rite

Aid supervisor, factory worker, and restaurant hostess. (R. 23-24).  The claimant alleged that she

is unable to work because of an accident at Rite Aid on September 22, 2006, that created

persistent back and leg pain. (R. 25).  She also testified that the medication she takes to reduce

the pain affects her ability to work because of the interfering side effects. (R. 25-27).

*Physical Limitations*

In 2002, four years before the alleged onset date of disability, the claimant initially

injured her back lifting stock boxes during her employment with Rite Aid. (R. 172).  The record

reflects no treatments until February 23, 2006, when treating physician Dr. Laubenthal, M.D., a

family and sports medicine specialist, completed an MRI on claimant.  The MRI indicated a

small left-sided disc herniation at L5-S1. (R. 157, 210).  On March 30, 2006, Dr. Laubenthal

diagnosed claimant with a herniated disk and suggested physical therapy. (R. 216)

On June 20, 2006, consulting physician Dr. Howard Fowler, an orthopedic surgeon,

examined claimant.  Dr. Fowler found a positive straight leg raise on the left with a mildly

4

positive contralateral straight leg raise, both producing radicular symptoms into her left leg.  Dr. Fowler agreed with Dr. Laubenthal that a disc herniation was present; however, Dr. Fowler did not find a palpable muscle spasm nor any neurologic deficits. (R. 13, 172). Dr. Fowler mentioned that the claimant was still able to work and perform her usual duties, but stated she needed a neurosurgical evaluation for possible surgery to remove the disc herniation. (R. 13, 173).

On September 22, 2006, claimant's alleged onset date of disability, she further injured her back during work, which placed her in the Northport Medical Center emergency room and allegedly forced her to stop working. (R. 23-24, 37-38, 264-266).  Dr. John O. Newcomb, evaluated claimant during her treatment at the Northport Medical Center emergency room, prescribed Meperidine and Promethazine, and referred her to Dr. Laubenthal for follow up care. (R. 264-266).

The claimant visited treating physician and neurosurgeon, Dr. Sean O'Malley, on August 29, 2006, who found that claimant's gait was good, her strength was a 5/5 and straight leg raise positive on the left, negative on the right. (R. 140).  A month later, Dr. O'Malley examined claimant again and found that her strength was normal, but that sensation was diminished in the S1 distribution on the left and to some extent in the L5 distribution.  Dr. O'Malley noted that claimant may have further herniation of a disc because she developed new deficit with sensory loss and an absent ankle jerk. (R. 139).  An MRI, which Dr. O'Malley ordered on October 9, 2006, identified a disc herniation in the left paracentral and subarticular zones, which displaces and questionably compresses the left S1 nerve root. Dr. O'Malley also noticed loss of height and the presence of disc dessiccation. (R. 225).

Dr. Laubenthal examined claimant on October 13, 2006, and discussed the results of her

recent MRI.  Dr. Laubenthal believed that the disc herniation at L5-S1 on the left is the source of her problem and told claimant that surgery was the next step.  Claimant agreed to proceed with a laminectomy and microdiscectomy. (R. 138).  On October 23, 2006, Dr. O'Malley performed the following surgical procedures on claimant: left-side L5-S1 hemilaminectomy (surgical removal of one side of the vertebral arch); medial facetectomy (surgical removal of a vertebral facet joint); foraminototny (procedure that relieves pressure from nerve root compresssion); and microdiscectomy (surgical removal of a spinal disc). (R. 245).

Two weeks after surgery, Dr. Laubenthal examined claimant and found that her gait was good and that she should increase her activities, but should refrain from strenuous activity. (R. 137, 239, 253).  On November 28, 2006, five weeks post-op, Dr. O'Malley noted similar findings, but found she had a positive straight leg raise. (R. 136, 252).  Dr. O'Malley completed another MRI on claimant a month later, which showed post-surgical changes at the L5-S1 level. An abnormal signal existed in the central, left paracentral and left subarticular zones demonstrating only partial enhancement on the post contrast images.  Dr. O'Malley found enhancing tissue lateral to the thecal sac on the left consistent with post operative changes, including the left S1 nerve root.  Also, Dr. O'Malley noticed disc bulges present at L4-5 and L3-4. (R. 243-244).

In January 2007, Dr. O'Malley advised claimant not to engage in any work at that time, but claimant could return to work once her symptoms were resolved. (R. 135).  Dr. O'Malley found claimant had decreased sensation in the S1 distribution and a positive straight leg raise, but normal strength. (R. 134, 236, 250).  Also in January of 2007, Dr. Laubenthal reported that claimant experienced tenderness in the present-lumbosacral region, moderately reduced range of

6

motion, and a positive straight leg raise on the left. (R. 155). He also referred claimant to Neurologist, Dr. Robert D. Robinson, for a second opinion.

Treating physician, Dr. Robinson, examined claimant in February 2007 and found that she experienced symptoms of left S1 radiculopathy and that she had a positive straight leg raise, which is consistent with continued neural compression. (R. 144). Because claimant's previous MRI was inadequate, Dr. Robinson ordered another MRI, which Dr. Jason Bearden, completed on February 20, 2007. (R. 142, 144). The MRI showed degenerative endplate change at L5-S1 and evidence of previous left hemilaminotomy, but no recurrent disc herniation. (R. 14, 142, 258).

On February 27, 2007, Dr. O'Malley noticed no measurable improvement with the therapy. On examination, he found claimant had a positive straight leg raise and her gait was better; however, her recent MRI showed post-operative changes with some granulation tissue, but it was not an obvious disc herniation. (R. 133, 235).

In March 2007, Dr. Robinson noticed some enhancing fibrosis in claimant's left lateral recess, but found no evidence of disc herniation from the recent MRI results. (R. 13, 15, 141). He told her that surgery was not a good option at this point, and he prescribed Lyrica to help with the pain. *Id.*

In June 2007, Dr. O'Malley ordered a CT myelogram of claimant's spine, which indicated a broad ventral extradural defect, more focal in the left paracentral region and slight posterior displacement of the left S1 nerve root and loss of contrast within the nerve root. (R. 233).

Claimant sought a second opinion from Dr. Carter Morris, located at the Birmingham

Neurosurgery & Spine Group, P.C. (R. 230).  He examined claimant in January 2008 and ordered

a follow-up MRI. (R. 227-229).  On examination, claimant's neurological symptoms included

numbness, tingling, and weakness. *Id.*  On February 4, 2008, the MRI results showed post

operative and degenerative findings at L5-S1 and enhancing soft tissue present within left lateral

recess that likely reflects epidural fibrosis associated with minimal disc protrusion. (R. 231-232).

Claimant testified that she takes the following  medications:  Lexapro, 10 mg, once daily

for depression; Lyrica, once daily for nerve pain; Lortab, 7.5 mg, as needed daily for pain; and

Celexa (a generic brand name for Citalopram, an antidepressant drug), 10 mg, once daily for

depression. (R. 107, 128, 143, 201, 206, 227, 230).  The medical record shows that Dr. Morris

prescribed Lyrica and that Dr. Laubenthal prescribed Lexapro; however, the record does not

reflect the doctor prescriptions for Lortab and Celexa. (R. 201, 229).

*Mental limitations*

Claimant testified that she discussed her depression with Dr. Laubenthal, a family and

sports medicine specialist, who assessed that claimant has mild depression and prescribed

Lexapro. (R. 43, 201).  Also, Dr. Morris, neurologist, found claimant was positive for depression.

(R. 228).  Claimant testified to taking Celexa for her depression, which she stated helps her

crying spells a little. (R. 44).  However, claimant also testified that she never received treatment

from a doctor/hospital/clinic nor any others for emotional or mental problems that may limit her

ability to work. (R. 105).

*The ALJ Hearing*

After the Commissioner denied the claimant's request for Disability Insurance Benefits

and Supplemental Security Income, the claimant requested and received a hearing before an ALJ.

(R. 9).  At the hearing, the claimant testified that her pain was in the lower back, which radiated

down her left leg causing tingling and numbness. (R. 27, 36).  She testified that on an average

day her pain reached a level of seven or eight on a scale of one to ten. (R. 29).

Claimant explained to the ALJ that she can walk about a block before having to sit down

from the pain and can sit for almost an hour before her back starts hurting. (R. 30).  She testified

that the medications she takes partially alleviate the pain, but that the pain can last until she falls

asleep at night. (R. 27).  She explained that the pain worsens when she lifts, bends, stoops, sits

down for too long or stands for too long.  (R. 28).

She stated the side effects she experiences from her prescribed medications, Lyrica and

Celerex, cause her to be drowsy and tired all day. (R. 26-27, 39, 45).  She explained that she

usually takes the medication once during the day and once at night. (R. 27, 39, 45).  She tried to

change her medication because of the side effects, but the doctor believed nothing else would

benefit her more than the medicines she was currently taking. (R. 27).

A vocational expert, Dr. Daniel Lustin, was present at the hearing; however, he did not

offer his opinion as to which jobs are available in the national economy, because the ALJ did not

ask Dr. Lustin any questions relating to claimant's work capabilities. (R. 20).

*The ALJ's Decision*

On August 27, 2009, the ALJ issued a decision finding the claimant was not disabled

under the Social Security Act. (R. 16).  The ALJ found that the claimant had not engaged in

substantial gainful activity since the alleged onset of her disability. (R. 11).  Next, the ALJ found

that the claimant's status/post left sided L5-S1 laminectomy and microdisectomy qualified as

severe impairments; however, the ALJ concluded that these impairments did not singly nor in

9

combination manifest the specific signs and diagnostic findings required by the Listing of Impairments. (R. 11-12).  Additionally, because the record does not reflect a diagnosis of depression by a mental health professional, the ALJ found her depression did not rise to the level of a medically determinable impairment. (R. 12).

The ALJ then considered the claimant's subjective allegations of pain to determine whether she had the residual functional capacity (RFC) to perform past relevant work. (R. 12). The ALJ found, in light of the objective evidence and in accordance with the pain standard guidelines, "the claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible...." (R. 14).  In making this determination, the ALJ did not explicitly mention the fact that medicines caused claimant's drowsiness. (R. 12).

The ALJ determined that claimant's RFC amounted to light, unskilled work with the following postural limitations:  occasional climbing, balancing, stooping, kneeling, crawling, and crouching. (R. 12).  Because this outcome differed from the light, skilled work required at Rite Aid, the ALJ concluded that claimant was unable to perform any past relevant work. (R. 15). The ALJ noted that if claimant could perform the full range of light, unskilled work, the Medical-Vocational Guidelines direct a finding of "not disabled." (R. 16).  The ALJ placed postural limits on claimant's RFC, but claimed the Social Security Rulings (SSR) declared the limitations have an insignificant impact on the work required for light, unskilled work.  *Id.*  Therefore, the ALJ determined that because the postural limitations had no effect on claimant's RFC, a finding of "not disabled" was appropriate. *Id.*

## IV.  DISCUSSION

The claimant asserts that she experiences drowsiness arising from pain medication that makes her sleep for most of the day and prohibits her from meeting the skill requirements of certain jobs.  She argues that the ALJ erred *either* by failing to properly apply the pain standard to this subjective testimony *or* by accepting her testimony but failing to limit her RFC and available jobs through the use of a vocational expert.

The Eleventh Circuit acknowledged that "[i]t is conceivable that the side effects of medication could render a claimant disabled or at least contribute to a disability." *Cowart v. Schweiker*, 662 F.2d 731, 737 (11th Cir. 1981).  Because the assertion of drowsiness and its extent is a subjective complaint, the ALJ must apply the pain standard in evaluating the claimant's testimony.  *See Holt*, 921 F.2d at 1223.  The pain standard requires an ALJ to consider whether the claimant demonstrated an underlying medical condition and either "(1) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (2) that the objectively determined medical condition is of such a severity that it can reasonably be expected to give rise to the alleged pain." *Id.*  "If the Secretary refuses to credit such testimony he must do so explicitly and give reasons for that decision.  Where he fails to do so we hold as a matter of law that he has accepted that testimony as true." *MacGregor*, 786 F.2d at 1054.

In the instant case, the claimant testified at the hearing about the pain she suffers and about the drowsiness that she experiences as a side effect of some of the medications she takes: Lyrica, Lortab, and Celexa.  Although the medical records do not reflect her complaints of drowsiness, drowsiness is a normal side effect of the pain medications reflected in those records

11

as prescribed for her pain.[2]  The ALJ applied the pain standard to claimant's subjective

complaints of *pain*, but failed to apply that standard to her subjective complaints of significant

*drowsiness* as a side effect of her medications.  Indeed, she did not explicitly address claimant's

testimony of drowsiness at any point in her opinion, and certainly did not give reasons for this

failure.  This silence means that the court cannot determine whether the ALJ simply ignored the

testimony or whether she rejected the testimony as not credible but failed to state her reasons for

doing so.  *See Cowart*, 662 F.2d at 737 (The ALJ must make a finding on the claimant's

testimony regarding the side effects of pain medication "making it possible for a reviewing

tribunal to know that the claim was not entirely ignored.").  Because the ALJ was silent on this

issue, the court must find that the ALJ accepted as true the claimant's testimony that she

experiences significant drowsiness during work hours because of the medicine.

　　　　Because the ALJ failed to address her testimony of drowsiness, the claimant argues that

the ALJ erred in failing to obtain vocational expert testimony regarding jobs available given her

problem with drowsiness.

　　　　The ALJ must consider the limiting effects of all impairments, even those that are not

severe, to determine the RFC. 20 CFR 416.945(e).  "Limitations or restrictions which affect

[one's] ability to meet the demands of jobs other than sitting, standing, walking, lifting, carrying,

pushing or pulling are considered nonexertional."  20 C.F.R. § 404.1569a(a), [20 C.F.R. §

416.969a(a)].  The Eleventh Circuit explained that "[w]hen there have been nonexertional factors

---

[2]A service of the U.S. National Library of Medicine and the National Institutes of Health,
<u>MedlinePlus</u>, Drugs, Supplements, and Herbal Information,
http://www.nlm.nih.gov/medlineplus/druginformation.html (last updated Mar. 16, 2011).

(such as depression and medication side effects) alleged, the preferred method of demonstrating that the claimant can perform specific jobs is through the testimony of a vocational expert." *MacGregor*, 786 F.2d at 1054.  In addition, where nonexertional limitations or restrictions within the light work category *are unclear*, testimony from a vocational expert may be necessary. SSR83-14, 1983-1991 Soc. Sec. Rep. Serv. 41, 1983 WL 31254, *2 (S.S.A.).  Moreover, "[a]lthough there is no *per se* rule that a vocational expert be called to testify, the ALJ must articulate specific jobs that the claimant is able to perform [given the nonexertional limitation], and this finding must be supported by substantial evidence." *Cowart*, 662 F.2d at 736 (emphasis added).

In this case, the ALJ neither solicited the vocational expert's testimony nor articulated specific jobs in the national economy available for someone with claimant's limitations and experiencing drowsiness as a medicinal side effect.  To explain why she found the testimony of the vocational expert to be unnecessary, the ALJ cited to rulings that support the insignificance of the effect of certain stated *postural* limitations on claimant's RFC.  However, she did not address the effect of claimant's *nonexertional* limitation of drowsiness on claimant's RFC, either through the testimony of the vocational expert or otherwise.  Rather, she found that claimant was able to perform the full range of light, unskilled work, despite her nonexertional limitation.  She did not, for example, limit claimant's ability to work around certain machines or at certain heights, where drowsiness might pose a safety hazard.

The court agrees that this finding was error, given the ALJ's failure to address the pain standard to discredit her testimony of drowsiness.  In light of this error, the court finds that substantial evidence does not support the ALJ's opinion.

13

**V.  CONCLUSION**

For the above reasons, the court finds that substantial evidence does not support the

ALJ's decision.  Therefore, the court will reverse the Commissioner's decision and will remand

it for the ALJ to determine whether the claimant is entitled to Disability Insurance Benefits or

Supplemental Security Income Payments.

A separate Order will be entered.

DONE and ORDERED this 23rd day of June 2011.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE

14